UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JAMES TILLMAN,

                Plaintiff,

-vs-                              Case No.  5:04-cv-219-Oc-10GRJ

CITY OF OCALA, FLORIDA, and SUSAN
MILLER, in her individual capacity,

                Defendants.

_____/

## O R D E R

This employment discrimination and retaliation case is before the Court for consideration of the Defendants' Amended Motion for Summary Judgment (Doc. 41), to which the Plaintiff has responded (Doc. 47).  The motion is ripe for review and the Court concludes that it is due to be denied in part and granted in part.

## BACKGROUND

James Tillman began working for the City of Ocala on February 8, 1999 as the deputy purchasing director for the city's purchasing department.[1]   The purchasing department is a "central purchasing organization charged with the buying of goods and services needed for each and every municipal function that comes under the city charter."[2] The purchasing department contained about eleven employees, about eight of whom were

---

[1]     Doc. 54, Pretrial Statement, Admitted Facts, pg. 15.

[2]     Doc. 38, Part 4, Deposition of James Tillman, pg. 22.

supervised by Mr. Tillman.[3] When Mr. Tillman became the deputy director of the purchasing department, James Crosby was serving as the director of the department.[4] After Mr. Crosby retired in May 2002, Bill Looney acted as the interim director of purchasing, and the City of Ocala began seeking permanent applicants for the position.[5]

Mr. Tillman, who is Caucasian, applied for the director of purchasing position in August 2002.[6] In addition to Mr. Tillman's application, the city received more than eighty applications for the director of purchasing position. Of those applications, only seven candidates were interviewed by the city, including Mr. Tillman and Darryl Muse, an African American who was at that time employed in the city's water and sewer department.[7] The initial interview panel included Don Corley (director of finance), Bill Looney (assistant city manager and interim purchasing director), and Sandra Wilson (director of human resources).[8] Four finalists for the director of purchasing position, including Mr. Tillman and

---

[3]     Doc. 38, Part 4, Deposition of James Tillman, pg. 27.

[4]     Doc. 38, Part 2, Deposition of Susan Miller, pg. 19.

[5]     Id.; Doc. 38, Part 4, Deposition of James Tillman, pg. 88; Doc. 47, Exh. V, Affidavit of James W. Crosby.

[6]     Doc. 47, Exh. J, James Tillman's Application and Resume.

[7]     Doc. 38, Part 4, Deposition of James Tillman, pg. 75; Doc. 38, Part 2, Deposition of Susan Miller, pg. 36-37; Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 30; Doc. 39. Part 2, Deposition of Bill Looney, pg. 13.

[8]     Doc. 38, Part 4, Deposition of James Tillman, pg. 76-77; Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 29-30. Two of the panelists were African Americans hired by Susan Miller, Ocala's city manager, and one panelist was Caucasian and promoted by Ms. Miller. Doc. 38, Part 2, Deposition of Susan Miller, pg. 50-51; Doc. 39. Part 2, Deposition of Bill Looney, pg. 11-12.

Mr. Muse, were interviewed for a second time by Susan Miller (city manager) and Bill Looney (assistant city manager).[9]

In hiring a new director of purchasing, Ms. Miller, Ocala' city manager, was looking to make the Department less "bureaucratic" and more "responsive" and "customer service oriented," she was seeking an applicant with "leadership qualities," "demonstrated understanding of the organization. . . specifically operations of the City of Ocala," and an "education. . . at least a Baccalaureate."[10]  The advertisement for the position contained "a statement of the minimum acceptable qualifications"[11] and stated in part:

> Applicants must have a four-year degree from an accredited college or university with major coursework in business management *and/or* certification as a Certified Purchasing Manager (CPM) or Certified Public Purchasing Officer (CPPO).  Minimum of five (5) years experience in a progressively responsible supervisory or administrative position in a Central Purchasing and Warehouse environment *or* an equivalent combination of training, education and experience.[12]

Mr. Tillman exceeded the minimum requirements set forth in the purchasing director position description because he was both a Certified Purchasing Manager and Certified Public Purchasing Officer, and he had over five years of experience in

---

[9]      Doc. 38, Part 4, Deposition of James Tillman, pg. 76-77; Doc. 39. Part 2, Deposition of Bill Looney, pg. 13.

[10]      Doc. 38, Part 2, Deposition of Susan Miller, pg. 26, 28-29, 33.

[11]      Id. at pg. 31.

[12]      Doc. 41, Exh. 19, Position Description for Director of Purchasing (emphasis added).

a supervisory position with a purchasing department.[13]  In fact, Mr. Tillman had over 25 years of purchasing experience, and had worked in the purchasing area with the Kissimmee Utility Authority and Manatee County Public Works, in addition to his work with the City of Ocala.[14]   When Mr. Tillman applied for the director of purchasing position, he was a high school graduate, and had earned sixty credits from various colleges, but never received a college degree.[15]

Darryl Muse also met the minimum requirements set forth in the purchasing director position description because he had both a four-year college degree and a masters in business administration degree, and he arguably had "an equivalent combination of training, education and experience" to five years of supervisory experience in a purchasing department.[16]   Mr. Muse's work experience can be summarized as follows.  Mr. Muse was in the Navy for four years where he training pilots on electronic warfare.[17]   After the military, in 1984, he went to work for Ford Aerospace where he worked as a field engineer supervisor and again working in the

---

[13]   See Doc. 47, Exh. J, James Tillman's Application and Resume.

[14]   Id.; Doc. 38, Part 4, Deposition of James Tillman, pg. 13, 16-17.

[15]   Doc. 38, Part 4, Deposition of James Tillman, pg. 21-22.

[16]   Doc. 47, Exh. I, Darryl Muse's Application and Resume.

[17]   Doc. 38, Part 3, Deposition of Darryl Muse, pg. 4.

4

field of electronics warfare training.[18]  In his position at Ford Aerospace, Mr. Muse's work related to maintaining, operating, repairing, supplying, and purchasing equipment.[19]  After Ford Aerospace, Mr. Muse went to work for Loral Aerospace where he ensured that the entire operation at Loral, which included the warehouse and purchasing group inventories, were maintained in a manner that was suitable to the military.[20]  In 1995, Mr. Muse was hired by the City of Ocala for a supervisory position in the water and sewer department.[21]  One of Mr. Muse's principal functions in the water and sewer department was to prepare a budget for the waste water utility.  Within that budget, Mr. Muse had to make provisions for procuring equipment and he worked with the purchasing department to estimate the cost of the equipment.[22]  In addition, Mr. Muse would work with the purchasing department when his department issued RFPs (requests for proposals) and to manage the inventory that was held in the purchasing warehouse for the water sewer department.[23]  While working in the water and sewer department, Mr. Muse also handled purchasing for the department if the item to be purchased was below $5,000

---

[18]   Id. at pg. 6-7.

[19]   Id. at pg. 7-8.

[20]   Id. at pg. 9-10.

[21]   Id. at pg. 13-14.

[22]   Id. at pg. 15.

[23]   Id. at pg. 16.

and managed the department's own warehouse, which was separate from the purchasing warehouse.[24]   Eventually, Mr. Muse was promoted to chief of central maintenance in the water and sewer department.[25]   Due to his experience with the water and sewer department, Mr. Muse developed a working knowledge to the standard procurement code as it applied to each department in the City of Ocala.[26]

During Mr. Muse's interview, the panel focused on his previous experience in procurement, his leadership and team building skills, his advanced degree in business administration, and his certification as a public manager by the State of Florida.[27]   Mr. Muse had experience with procurement through his positions with Loral Space, Ford Aerospace, and the water and sewer department.[28]   In particular, Ms. Miller stated that due to his position as chief of central maintenance for the City of Ocala, "Mr. Muse had a very high level grasp of the management of the city and the [purchasing] requirements of the city."[29]   Ms. Miller stated that:

---

[24]     Id. at pg. 17-18.

[25]     Id. at pg. 19.

[26]     Id. at pg. 26.

[27]     Doc. 38, Part 2, Deposition of Susan Miller, pg. 42.  Mr. Muse stated in his deposition that he did not receive his certification as a public manager until June of 2003, after he was selected as the director of purchasing.  Doc. 38, Part 3, Deposition of Darryl Muse, pg. 32.

[28]     Doc. 38, Part 2, Deposition of Susan Miller, pg. 43-45.

[29]     Id. at pg. 46.

> [H]e was able to clearly articulate his understanding of operational needs by virtue of the fact that he was in operations.  His leadership role that he had taken within the department in doing the privatizations, studies we did in the department.  He took a leadership role in helping the department head define how to better do the work, how to better procure the products needed.  Just a variety of different things as we actually challenged ourselves to operate like a private sector organization . . . and Mr. Muse was very much an integral part of that process and had demonstrated, not only in his relating how he had responded in this process, but also in relating how he had supported it, had come to understand the importance of benchmarking, the importance of marking one's self against extraordinary criteria, rather than same ol' same ol'. Clearly the leadership skills, the analytical skills that I was looking for [in] the purchasing director.[30]

Mr. Muse never worked in a purchasing department, and his only experience with purchasing was "on the customer's side of the equation," but Ms. Miller nevertheless thought that Mr. Muse's training, education, and experience exceeded the minimum qualifications for the director of purchasing position.[31]

Although Ms. Miller did not recall any specific or negative comments by the panelists about Mr. Tillman after the interviews, during her tenure as city manager she became familiar enough with Mr. Tillman's work to develop some concerns.[32] Ms. Miller testified that "[t]he concerns related to the relationships with the operating departments and the ability of the purchasing department as a whole, in particular, Mr. Tillman.  Their ability to have a timely turnaround of the procurement requirements of the departments, the operating departments, was basically a

---

[30]    Id. at pg. 47.

[31]    Id. at pg. 48, 50.

[32]    Id. at pg. 15, 52.

7

customer service issue."[33]  In particular, Ms. Miller spoke of one incident where Mr.

Tillman provided inaccurate calculations to the city council with respect to a bid,

which resulted in the city having to negotiate a contract amendment.[34]  Ms. Miller

associated the "bureaucratic nature" of the purchasing department under Mr. Crosby

with Mr. Tillman.[35]

Mr. Tillman's performance evaluations for the time period before he applied

for the director of purchasing position also support Ms. Miller's concerns.  During his

first six months of employment with the City of Ocala, Mr. Tillman had difficulties with

two of his subordinates, whom he claimed were "not very customer-oriented."[36]  Mr.

Tillman's difficulties with his subordinates were again an issue in his February 2000

and February 2001 performance evaluations.[37]  Mr. Tillman's last evaluation by Mr.

Crosby, completed in February of 2002, gave Mr. Tillman an "exceeds requirements"

rating, but also cited concerns between Mr. Tillman and his subordinates.[38]  In

particular, the evaluation stated that Mr. Tillman "needs to work closer with

---

[33]     Id. at pg. 20.

[34]     Id. at pg. 20-21.

[35]     Id. at pg. 26.

[36]     Doc. 38, Part 4, Deposition of James Tillman, pg. 41.

[37]     Id. at pg. 44-47, 49-50; Doc. 41, Exh. 11, Performance Evaluation for February 4, 2000.

[38]     Id. at pg. 58-59.

employees on conduct & disputes . . . to work on morale, teamwork and loyalty with pears [sic] and subordinates . . . [and] needs to work on his interpersonal skills, staff development, delegation, follow up, and accountability in relationship to their assignments."[39]  Despite these concerns, Ms. Miller had no doubt that Mr. Tillman met the minimum qualifications for the director of purchasing position.[40]

After the interviews, the panel concluded that the two top candidates were Bill Stephenson and Darryl Muse because they had met or exceeded the minimum requirements for the position and demonstrated leadership qualities.[41]  Ms. Miller selected Darryl Muse for the position.[42]

Mr. Tillman was "flabbergasted" when Mr. Muse was selected as director of purchasing.[43]  His "initial concern was that Mr. Muse did not possess the qualifications of a purchasing director."[44]  However, Mr. Tillman admitted that Mr. Muse met the minimum qualifications as described in the director of purchasing job

---

[39]     Doc. 41, Exh. 1, February 2002 Performance Evaluation.

[40]     Doc. 38, Part 2, Deposition of Susan Miller, pg. 35.

[41]     Id. at pg. 52; Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 33-34.

[42]     Doc. 47, Exh. K, City of Ocala Press Release: "City Names New Purchasing Director."

[43]     Doc. 38, Part 4, Deposition of James Tillman, pg. 86.

[44]     Id. at pg. 94-95.

description.[45]  Mr. Tillman came to the conclusion that Mr. Muse's race was a

"contributing factor" to his promotion when he considered the fact that "Mr. Muse did

not have the purchasing experience" together with the fact that human resources

was tracking promotions of black employees, that a city councilwoman stated that

the city needed to have more representation in management-level positions of

African Americans, and that the city manager had a pattern of hiring minorities into

director positions.[46]  In addition, Mr. Crosby, Mr. Tillman's former supervisor and the

city's most recent director of purchasing, told Mr. Tillman that City Manager Susan

Miller and Assistant City Manger Bill Looney stated that when he retired "they

intended to hire a minority person to fill [his] position as Director of Public

Purchasing."[47]

    The City of Ocala and those involved with filling the director of purchasing

position deny taking race into account in finding a new director.  Ms. Miller was

aware that a city councilwoman was concerned about having more minorities in

---

[45]    Id. at pg. 96.

[46]    Id. at pg. 97-99, 105; Doc. 47, Exh. H, "Promotions of Black Employees Since 5/10/99 Prepared by the City of Ocala Human Resources Department on 10/28/02."  Before Ms. Miller became city manager, none of the department heads for the City of Ocala's thirty departments were African American, but during her tenure, three African Americans were either hired or promoted into department head positions – Don Corley, the finance director, Sandra Wilson, the human resource director, and Darryl Muse, the purchasing director.  Doc. 38, Part 3, Deposition of Darryl Muse, pg. 35-37. But Ms. Miller also promoted or hired at least half a dozen Caucasian department heads and supervisors during her tenure.  Id.

[47]    Doc. 47, Exh. V, Affidavit of James W. Crosby; Doc. 38, Part 4, Deposition of James Tillman, pg. 82.

management positions with the city.[48]   But Ms. Miller testified that the councilwoman's position did not impact her job – the city had an equal opportunity policy and her job was to follow that policy.[49]   According to Ms. Wilson, the human resources director, the fact that Mr. Muse was an African American was not a consideration in his promotion, however, she admitted that she was "pleased" to see such a well-qualified African American apply for the position.[50] Mr. Looney also testified that the panel did not take race into account when hiring an individual for the director of purchasing position.[51]

After Mr. Tillman began to suspect that Mr. Muse was hired because of his race, he first spoke to Mr. Looney about the fact that he thought Mr. Muse was unqualified for the position (not his race concerns).   Then Mr. Tillman filed a grievance with regard to the promotion, and the grievance was dismissed because "management employees could not file grievances."[52]   About five or six months after Mr. Muse became the director of purchasing (around May 2003), he learned that Mr. Tillman had filed an internal grievance with respect to the promotion process for the

---

[48]     Doc. 38, Part 2, Deposition of Susan Miller, pg. 52-53.

[49]     Id. at pg. 53.

[50]     Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 23-24.

[51]     Doc. 39. Part 2, Deposition of Bill Looney, pg. 11.

[52]     Doc. 38, Part 4, Deposition of James Tillman, pg. 106-108; Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 35.

director of purchasing position.[53]  Mr. Muse testified that he was not aware that race was the basis of Mr. Tillman's complaint.[54]

Despite Mr. Tillman's concerns about Mr. Muse, he went to work for Mr. Muse as his deputy director of purchasing in November of 2002.[55]  While working under Mr. Muse, Mr. Tillman continued to have the same "occasional" problems with several of his employees.[56]  Mr. Tillman thought that the employees he had problems with "added a lot more bureaucratic channels" and he wanted to simplify the purchasing process.[57]  Mr. Tillman also felt like several of the employees went around him and directly to Mr. Muse, and Mr. Tillman thought that Mr. Muse did not discourage this behavior even though he talked to Mr. Muse about it.[58]

On December 2, 2002, Mr. Tillman filed a complaint with the Florida Commission on Human Relations regarding the promotion process, and Ms. Wilson received a copy of the complaint.[59]  Mr. Tillman alleged in his complaint that he was

---

[53]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 44.

[54]     Id.

[55]     Doc. 38, Part 4, Deposition of James Tillman, pg. 108; Doc. 38, Part 3, Deposition of Darryl Muse, pg. 43.

[56]     Doc. 38, Part 4, Deposition of James Tillman, pg. 109.

[57]     Id.

[58]     Id. at pg. 112.

[59]     Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 36; Doc. 41, Exh. 2, FCHR Complaint Dated December 2, 2002.

qualified for the director of purchasing position, but instead an unqualified black male received the position.[60]   Ms. Wilson worked with the city attorney to prepare a response to the complaint, which was submitted to the Commission in February 2003.[61]

In February of 2003, Mr. Muse prepared a performance evaluation for Mr. Tillman.[62]   The evaluation stated that Mr. Tillman had been cooperative with Mr. Muse's initiatives and that Mr. Muse would "encourage Jim to work towards normalizing relations between he and his staff."[63] Mr. Muse stated that he made this latter comment because there were conflicts between Mr. Tillman and several of his subordinates.[64]   The conflicts related to "management style, management issues, inconsistency in management, [and] complaints about treatment."[65]   Mr. Muse observed that both Mr. Tillman and his subordinates needed to treat each other with more respect.[66]  Mr. Tillman came to Mr. Muse and told him that employees were being insubordinate towards him, and Mr. Muse told Mr. Tillman that disciplinary

---

[60]     Doc. 41, Exh. 2, FCHR Complaint Dated December 2, 2002.

[61]     Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 40-41; Doc. 41, Exh. 3, Response Packet.

[62]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 48.

[63]     Id.; Doc. 41, Exh. 4, 2003 Performance Evaluation.

[64]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 48.

[65]     Id. at pg. 48-49.

[66]     Id. at pg. 49.

action needed to be initiated against them.[67]  Mr. Tillman did not discipline the employees.[68] Mr. Tillman's evaluation from this period also included comments from Mr. Looney, the interim purchasing director, who stated that "Jim needs to improve on prioritizing his time to assure the proper focus in [sic] placed on those contracts that are time sensitive or of more immediate importance."[69]

On August 11, 2003, Mr. Tillman filed a second complaint with the Florida Commission on Civil Rights alleging retaliation, which the human resources department received and brought to the attention of the Ms. Miller and Mr. Muse.[70] In his second complaint, Mr. Tillman claimed that the City of Ocala and Ms. Miller retaliated against him for filing his initial complaint and did not allow him to attend out-of-state conferences and staff meetings.[71] As evidence of retaliation, Mr. Tillman claimed that other departments were allowed to attend out-of-state conferences

---

[67]     Id. at pg. 50.  Mr. Tillman admitted in his deposition that he had at least one meeting with Mr. Muse and Ms. Wilson with respect to disciplining the employees he was having problems with.  Doc. 38, Part 4, Deposition of James Tillman, pg. 136.  Mr. Tillman did not feel like he had Mr. Muse's support in correcting the employees' behavior because Mr. Muse did not encourage employees to go through Mr. Tillman before going to Mr. Muse and did not conduct individual meetings with the staff members.  Id. at 136-137.

[68]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 50.

[69]     Doc. 41, Exh. 4, 2003 Performance Evaluation.

[70]     Doc. 38, Part 4, Deposition of James Tillman, pg. 142; Doc. 38, Part 5, Deposition of Sandra Wilson, pg. 48-49; Doc. 41, Exh. 5, FCHR Complaint Dated August 11, 2003.

[71]     Doc. 38, Part 4, Deposition of James Tillman, pg. 142; Doc. 41, Exh. 5, FCHR Complaint Dated August 11, 2003.

14

during the same time period when he was not.[72]  In addition, Mr. Tillman claimed he was not allowed to attend staff meetings when Mr. Muse was available and the deputy director would normally fill in.[73]  The City of Ocala responded to Mr. Tillman's complaint on September 22, 2003.[74]

A series of events led up to Mr. Tillman's termination of employment with the City of Ocala.  First, Mr. Muse received complaints from department heads that Mr. Tillman was taking too long to work on their projects – they felt he was not prioritizing his time effectively.[75]  One department thought that Mr. Tillman was "deliberately bottlenecking" some of their efforts to purchase equipment.[76]  The complaints were not reflected in Mr. Tillman's evaluation, however Mr. Tillman admitted that Mr. Muse spoke to him about complaints from the purchasing department's "consumers" (the other city departments).[77]

In addition, on September 8, 2003, Mr. Muse opted to change the bidding process for a particular bid (he decided not to post the bid through a particular bidding service as normal, but posted the bid by other means), and, according to Mr.

---

[72]    Doc. 38, Part 4, Deposition of James Tillman, pg. 146-147.

[73]    Id. at pg. 147.

[74]    Doc. 47, Exh. N, City of Ocala's Response Dated September 22, 2003.

[75]    Doc. 38, Part 3, Deposition of Darryl Muse, pg. 57.

[76]    Id.

[77]    Id. at pg. 58; Doc. 38, Part 4, Deposition of James Tillman, pg. 113.

Muse, Mr. Tillman accused Mr. Muse and other employees of being unethical.[78]  Mr.

Muse thought it was wrong for Mr. Tillman "to yell at [him] and other employees" in

a voice which "was loud enough to affect the customer service area" of the

building.[79]  Thereafter, Mr. Muse issued a written reprimand to Mr. Tillman, which Mr.

Tillman disputed because "nobody else heard anything out of the office" and he did

not yell.[80]

On September 18, 2003, Mr. Muse notified Mr. Tillman by letter that it was

inappropriate for him to discuss his pending grievance against the city with

employees, which Mr. Tillman admitted he had done.[81]

In October 2003, Mr. Muse considered a department's request to buy a cab

and chassis outside the regular bidding process.[82]  Mr. Tillman raised concerns

about going outside the bidding process, but ultimately Mr. Muse decided to allow

the department to buy the cab and chassis without going through the competitive

---

[78]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 75; Doc. 38, Part 4, Deposition of James Tillman, pg. 117-118, 122.  Mr. Tillman stated that the change in the posting process was not illegal, but it appeared to restrict competition.  Id. at 117.

[79]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 75.

[80]     Id. at 76; Doc. 38, Part 4, Deposition of James Tillman, pg. 123-125; Doc. 41, Exh. 7, Written Reprimand Dated October 8, 2003.

[81]     Doc. 38, Part 4, Deposition of James Tillman, pg. 127-128; Doc. 41, Exh. 8, Letter from Mr. Muse to Mr. Tillman Dated September 18, 2003.

[82]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 83-84.

bidding process, and the purchase was approved by the city council.[83]  Thereafter, in early November 2003, Mr. Tillman brought this purchase to the attention of the city attorney without Mr. Muse's permission.[84]  Mr. Tillman stated that it was "standard procedure" to go to the city attorney when he felt like a purchase was possibly illegal or unethical.[85]

On November 21, 2003, Mr. Muse terminated Mr. Tillman's employment.[86] The letter notifying Mr. Tillman of his termination stated that he was terminated for failure to follow directives of the department head in handling department issues, inability to effectively manage subordinates, and unsatisfactory service to user departments.[87] Mr. Tillman thought the reasons cited for his termination were pretext for the actual reason he was fired – because he filed a discrimination charge.[88]

Mr. Tillman filed another charge of retaliation against the City of Ocala and

---

[83]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 84-85; Doc. 38, Part 4, Deposition of James Tillman, pg. 115, 160-165; Doc. 41, Exh. 13, Purchase Requisition.

[84]     Doc. 38, Part 3, Deposition of Darryl Muse, pg. 87-88; Doc. 38, Part 4, Deposition of James Tillman, pg. 173.  Mr. Tillman admitted that Mr. Muse did not learn that he had gone to the city attorney for advice until after the fact.  Id. at 179.

[85]     Doc. 38, Part 4, Deposition of James Tillman, pg. 164.

[86]     Id. at pg. 8; Doc. 38, Part 3, Deposition of Darryl Muse, pg. 94; Doc. 41, Exh. 17, Letter of Termination Dated November 21, 2003.

[87]     Doc. 41, Exh. 17, Letter of Termination Dated November 21, 2003.

[88]     Doc. 38, Part 4, Deposition of James Tillman, pg. 183.

Ms. Miller in December of 2003.[89]  In this last charge, Mr. Tillman claimed that he

was terminated because he complained about the selection process of the

purchasing director.[90]

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary

judgment is appropriate only when the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law."  In Celotex Corp. v. Catrett, the Supreme Court recognized that

"the plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."[91]  The moving

party bears the initial burden of establishing the nonexistence of a triable fact issue.

If the movant is successful on this score, the burden of production shifts to the non-

moving party who must then come forward with "sufficient" evidence of every

element that he or she must prove."[92]  The non-moving party may not simply rest on

the pleadings, but must use affidavits, depositions, answers to interrogatories, or

---

[89]   Id. at pg. 152.

[90]   Id. at pg. 153.

[91]   477 U.S. 317, 322 (1986).

[92]   Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).

other admissible evidence to demonstrate that a material fact issue remains to be tried.[93]

## DISCUSSION

The Plaintiff's Amended Complaint alleges that the Defendants discriminated and retaliated against him while he was employed with the City of Ocala in violation of the Title VII, 42 U.S.C. § 1983, and the Florida Civil Rights Act.  The Court will address each claim in turn.

### I. RACE DISCRIMINATION

At the onset, it should be mentioned that the fact that this case involves race discrimination against a white employee has no effect on how the Court analyzes the claim.  According to the Eleventh Circuit, "[r]acial discrimination against whites is just as repugnant to constitutionally protected values of equality as racial discrimination against blacks."[94]  Consequently, the Plaintiff's claims will be analyzed exactly the same as any other racial discrimination claim.[95]

Title VII makes it unlawful for an employer to discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of

---

[93]     Celotex, 477 U.S. at 324.

[94]     Bass v. Board of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1103 (11th Cir. 2001).

[95]     See id. at 1102-03.

19

employment, because of such individual's race."[96]  And, in a Title VII action, the Plaintiff bears the burden of proving his prima facie case, by way of direct, statistical, or circumstantial evidence.[97]

In the absence of either direct or statistical evidence of discrimination, a Plaintiff must rely on circumstantial evidence in order to establish his prima facie case.  Thus, pursuant to the burden shifting framework established by the Supreme Court in McDonnell Douglas,[98] in order to prevail on his race discrimination claim, the Plaintiff must show that: "(1) he was qualified and applied for the position; (2) he was rejected despite his qualifications; and (3) other equally or less qualified employees who are not members of his race were hired."[99]  Then, if the Plaintiff establishes facts that are adequate to permit an inference of racial discrimination, the burden of production shifts to the Defendants to rebut the inference of discrimination by offering "legitimate, non-discriminatory reasons" for the Defendants' rejection of the Plaintiff for the promotion.[100]

If the Defendants meets their burden of production, in order to survive summary judgment, the Plaintiff must present evidence to demonstrate that the

---

[96]     42 U.S.C. § 2000e-2(a).

[97]     Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997).

[98]     McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[99]     Bass, 256 F.3d at 1104.

[100]    Id.

Defendants' articulated reason for promoting someone from a different race instead of the Plaintiff is a mere pretext for discrimination.[101]  To meet this burden, the Plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence."[102] And, the Supreme Court has held that on the issue of whether an employer's explanation is pretextual, "the trier of fact may still consider evidence establishing the Plaintiff's prima facie case and inferences properly drawn therefrom."[103]

The Court concludes that Plaintiff has presented sufficient circumstantial evidence to establish a prima facie case of racial discrimination under Title VII.  The Plaintiff has presented evidence which demonstrates that he was qualified for the director of purchasing position, including Defendant Susan Miller's admission that the Plaintiff at least met the minimum qualifications established for the director of purchasing position, and evidence that the Plaintiff was a finalist for the director of purchasing position out of a pool of over eighty applicants and had over 25 years of experience in purchasing.  Not only has the Plaintiff shown that he was qualified and applied for the director of purchasing position, and he was rejected despite his qualifications, there is a genuine issue of material fact with respect to whether Darryl Muse, another employee who was not a member of the Plaintiff's race, was equally

---

[101]    Id.

[102]    Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

[103]    Id.

or less qualified than the Plaintiff.  While the evidence shows that Mr. Muse's education exceeded the Plaintiff's, the Plaintiff's purchasing experience surpassed Mr. Muse's experience in purchasing.  And while Mr. Muse may have demonstrated leadership abilities, the Plaintiff had acquired several certifications relating to purchasing in which Mr. Muse had not obtained.  There is an obvious fact issue as to which candidate was more qualified, or whether one candidate was equally or less qualified than the other due to their different qualifications and experiences.

Since the Plaintiff has established a prima facie case of racial discrimination, the burden shifts to the Defendants to present legitimate, non-discriminatory reasons for their actions.  While the Defendants may be able to meet this burden, the Plaintiff has also met the burden of showing that the Defendants' proffered reasons for hiring Mr. Muse are mere pretext for discrimination.  Specifically, Mr. Crosby, the director of purchasing for the City of Ocala until May 2002, testified that City Manager Susan Miller and Assistant City Manager Bill Looney told him that they intended to hire a minority for the director of purchasing position.  In addition, there is evidence that the City of Ocala's Department of Human Resources tracked "promotions of black employees" near the time Mr. Muse was selected for the director of purchasing position, further supporting a finding that the Defendants were motivated by race in selecting Mr. Muse.[104]

---

[104]     The Defendants failed to address both Mr. Crosby's affidavit and the document
(continued...)

Accordingly, since the Plaintiff has presented sufficient evidence to establish a genuine issue of material fact as to whether the Defendants discriminated against him on the basis of his race, summary judgment with respect to this claim is due to be denied.[105]

## II. RETALIATION

Title VII also makes it unlawful for an employer to discriminate against an employee that has engaged in statutorily protected expression.[106]  And, the Court has held that a claim for retaliation pursuant to 42 U.S.C. § 2000e-3, is subject to the McDonnell Douglas burden shifting framework.[107]

---

[104](...continued)
produced by the Plaintiff which shows that the City of Ocala's Department of Human Resources prepared a chart tracking "Promotions of Black Employees" from May 10, 1999 until October 28, 2002 in their Motion for Summary Judgment, other than their argument that the document from human resources is the Plaintiff's "attempt to confuse the issues."  The Defendants focus their argument in their Motion for Summary Judgment on Mr. Muse's and the Plaintiff's qualifications, and the Court has found a genuine issue of fact exists as to this issue.

[105]     Since the Plaintiff has presented sufficient evidence to survive summary judgment with respect to his Title VII claim, the Plaintiff's racial discrimination claims brought pursuant to 42 U.S.C. § 1983 and the Florida Civil Rights Act also survive summary judgment because the Plaintiff's racial discrimination claim is subject to the same legal analysis under each law.  See Cross v. Alabama State Dept. of Mental Health & Retardation, 49 F.3d 1490, 1507-08 (11th Cir. 1995) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e-2], the elements of the two causes of action are the same" (quotations and citations omitted)); Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) ("[D]ecisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII.").

[106]     42 U.S.C. § 2000e-3.

[107]     Chambers v. Walt Disney World Co., 132 F. Supp. 2d 1356, 1368 (M.D. Fla. 2001).

Thus, in order to establish his prima facie case of retaliation, the Plaintiff must show that he has suffered an adverse employment action, and that such action was causally related to his complaint.[108]  "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."[109]

Then, if the Plaintiff establishes his prima facie case, the Defendants may proffer legitimate, non-discriminatory reasons for their employment action, and the Plaintiff must offer evidence to demonstrate that the Defendants' reasons are a mere pretext for retaliation.[110]   If the Plaintiff creates an issue of  fact as to the reasonableness of the Defendants' actions, then summary judgment for the Defendants would be inappropriate.

The Court concludes that summary judgment with respect to the Plaintiff's retaliation claim is due to be denied.  The Plaintiff's termination of employment was in close proximity to the Plaintiff's protected activity, the filing of a complaint with Florida Human Relations Commission, and even closer in proximity to the City of Ocala's response to his complaint.  In addition, the Plaintiff has presented evidence that the Defendants' proffered reasons for his termination were pretext.  Specifically,

---

[108]   Holifield, 115 F.3d at 1566; See also Shannon v. BellSouth Telecommunications, Inc., 292 F.3d 712, 715 (11th Cir. 2002).

[109]   Bass, 256 F.3d at 1119 (quotations and citations omitted).

[110]   Holifield, 115 F.3d at 1566; See also Shannon, 292 F.3d at 715.

24

the Plaintiff showed that he was relatively successful in his position as deputy director of purchasing for about five years, and then he was terminated near the time he filed a complaint with the Commission.

## III. QUALIFIED IMMUNITY

"Officials are entitled to qualified immunity if a reasonable official could have believed h[er] actions were lawful in light of clearly established law."[111] "To receive qualified immunity, the public official must first prove that [s]he was acting within the scope of h[er] discretionary authority when the allegedly wrongful acts occurred."[112] "If the defendant was not acting within h[er] discretionary authority, [s]he is ineligible for the benefit of qualified immunity."[113] "Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate."[114]

The Eleventh Circuit applies a two part analysis to determine if an official is entitled to qualified immunity. The initial inquiry "is whether [the] plaintiff's

---

[111]    Wilson v. Bailey, 934 F.2d 301, 304 n.1 (11th Cir. 1991) (quotations and citations omitted).

[112]    Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1267 (11th Cir. 2003) (quotations and citations omitted).

[113]    Id. (quotations and citations omitted).

[114]    Id. (quotations and citations omitted).

allegations, if true, establish a constitutional violation."[115]  "If a constitutional right would have been violated under the plaintiff's version of the facts, the next, sequential step is to ask whether the right was clearly established."[116]

Here, the Plaintiff alleges that Susan Miller was motivated by race in promoting Mr. Muse into the director of purchasing position rather than the Plaintiff. Whenever a government official treats anyone unequally due to his or her race, "that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection."[117]  And the right to be free from race discrimination in employment is a clearly established constitutional right.[118] Accordingly, since it has not been shown that a reasonable official would have believed her actions were lawful in light of clearly established law, it cannot be said that Defendant Susan Miller is entitled to qualified immunity.

## IV. PUNITIVE DAMAGES

The Defendants contend that the Plaintiff's claim for punitive damages against the City of Ocala should be dismissed, to which the Plaintiff has not responded.  The Court concludes the Plaintiff cannot seek punitive damages against the City of Ocala

---

[115]   Id. at 1268 (quotations and citations omitted).

[116]   Id. (quotations and citations omitted).

[117]   Id. at 1269 n.16 (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 229-30, (1995)).

[118]   See Id. at 1270-71.

for its alleged discriminatory and retaliatory conduct under the Florida Civil Rights Act, Title VII, or 42 U.S.C. § 1983.[119]  Accordingly, the Plaintiff's claims for punitive damages against the City of Ocala are dismissed.

## CONCLUSION

Upon due consideration, and for the foregoing reasons, it is ordered that:

(1) the Defendants' Motion for Summary Judgment (Doc. 41) is DENIED with respect to the Plaintiff's race discrimination and retaliation claims, and GRANTED with respect to the Plaintiff's punitive damages claim against the City of Ocala; and

(2) the Clerk is directed to withhold the entry of judgment pending the resolution of this case as a whole.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 26th day of September, 2005.

_____

**UNITED STATES DISTRICT JUDGE**

Copies to:   Counsel of Record

---

[119]   See Fla. Stat. § 760.11(5); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267 (1981); Walters v. City of Atlanta, 803 F.2d 1135, 1148 (11th Cir. 1986); 42 U.S.C. § 1981a(b)(1).